# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| KIM KEISTER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:18-cv-2385 (KBJ) |
| ) | |
| AARP BENEFITS COMMITTEE, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

Plaintiff Kim Keister worked as an employee of AARP, Incorporated, for approximately 12 years prior to having a stroke that allegedly required him to stop working. Keister first pursued long-term disability benefits under the company's disability benefits plan administratively, and he now seeks such relief from this Court. (*See* Compl., ECF No. 1.) Notably, back when Keister was unsuccessfully trying to secure disability benefits from AARP through the administrative process, he was also engaging in negotiations with AARP regarding the terms of his separation. To that end, in exchange for severance pay, Keister executed a separation agreement that included a "general release" and expressly waived "any and all claims" against AARP and certain other entities. (Ex. B to Aetna's Reply in Supp. of Mot. for Summ. J. ("Release"), ECF No. 20-1, at 3, ¶ 2; *see also id.* at 5.)[1] The instant complaint eventually followed; Keister alleges that defendant AARP Benefits Committee ("AARP Benefits"), which is

---

[1] Page-number citations to the documents that the parties have filed refer to the page numbers that the Court's electronic filing system automatically assigns.

the administrator of AARP's disability benefits plan, and defendant Aetna Life Insurance Company ("Aetna"), the insurer of that plan, have wrongfully denied him disability benefits that he is entitled to receive under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* (*See* Compl. ¶ 1.)

Before this Court at present are two summary judgment motions that Defendants have filed, challenging Keister's right to pursue his disability benefits claim before this Court in light of the executed waiver. On September 30, 2019, this Court issued an Order that **GRANTED** both of Defendants' motions. (*See* Order, ECF No. 26.) This Memorandum Opinion explains the reasons for that Order. In short, this Court agrees with Defendants that, by signing the separation agreement, Keister waived his right to bring the instant claim for long-term disability benefits, which means that his case cannot proceed as a matter of law.

## I.    BACKGROUND

### A.    Basic Facts[2]

From 2004 to late 2017, Keister was an employee of AARP and a participant in the company's Long Term Disability Insurance Plan. (*See* Compl., ¶¶ 5, 11.) AARP Benefits administered the Plan, which Aetna insured. (*See id.* ¶¶ 5, 9.) In August of 2016, Keister suffered a stroke. (*See id.* ¶¶ 7, 19.) Keister subsequently began a medical leave of absence and did not return to work until January of 2017. (*See* AARP Benefits' Stmt. of Undisputed Material Facts in Supp. of Mot. for Summ. J. ("AARP

---

[2] The facts recited herein have generally been drawn from Keister's complaint and the parties' briefs and exhibits, and are undisputed unless otherwise noted.

Benefits' Stmt."), ECF No. 11-2, ¶¶ 2, 3; Pl.'s Resp. to AARP Benefits' Stmt., ECF No. 15-1, at 1.)

Early in 2017, Keister applied for and was granted short-term disability benefits, which he exhausted on August 2, 2017; this date also marked the official end of Keister's employment with AARP. (*See* Compl. ¶¶ 23, 26, 29; AARP Benefits' Mem. in Supp. of Mot. For Summ. J. ("AARP Benefits' Mem."), ECF No. 11-1, at 2 (stating that Aug. 4, 2017, was Keister's final date of employment); *see also id.* at 2 (stating that Keister's position was eliminated "as part of a reorganization effective June 30, 2017").) Sometime after he sought short-term disability benefits, Keister also applied for long-term disability benefits. (*See* Compl. ¶¶ 13, 19–28.) Aetna denied Keister's application for long-term disability benefits on July 18, 2017, claiming that Keister did not prove that he met the physical disability requirement of the plan and that he was unable to work. (*See id.* ¶ 28.) Keister appealed on January 14, 2018, but Aetna affirmed the denial of long-term benefits on June 13, 2018. (*See id.* ¶¶ 35, 36.)

Meanwhile, on September 27, 2017, after Keister's initial application for long-term disability benefits had been denied but before his appeal, Keister separately signed a Confidential Separation Agreement and General Release ("the Release") with AARP in exchange for severance pay. (*See* Aetna's Stmt. of Undisputed Material Facts in Supp. of Mot. for Summ. J. ("Aetna's Stmt."), ECF No. 17-5, ¶ 8; Release at 5.) Significantly for present purposes, by signing the Release, Keister specifically agreed to

> fully and forever waive, discharge, and release AARP, its subsidiaries and its affiliated and related entities and their respective officers, directors, representatives, employees, agents, successors, and assigns, whether current or former, and employee benefit programs (and the trustees, administrators, fiduciaries, and insurers of such programs) from any and all claims for damages, personal

injuries, discrimination, retaliation, reinstatement, or other relief
that [he] may have against them, based upon [his] employment,
separation, and/or any event or transaction that occurred prior to
[his] signing this Agreement.

(Release at 3, ¶ 2; *see also id*. (clarifying that the release encompasses "any . . . legal or

equitable claim of any kind, whether based upon statute, contract, tort, common law,

ordinance, regulation or public policy . . . whether now known or unknown, which may

have resulted from your AARP employment or separation or otherwise, up to and

including the date you sign this Agreement.").)

### B.    Procedural History

Keister timely filed the instant lawsuit on October 16, 2018.  (*See* Compl.)  His

one-count complaint claims that Defendants wrongfully denied him long-term disability

benefits under ERISA.  (*See id*. ¶¶ 39–44.)  Aetna filed an answer on November 29,

2018 (*see* ECF No. 10), and an amended answer on December 17, 2018 (*see* ECF No.

13).  Both Defendants filed motions for summary judgment on December 10, 2018 (*see*

AARP Benefits' Mot. for Summ. J. ("AARP Benefits' Mot."), ECF No. 11), and on

January 23, 2019 (*see* Aetna's Mot. for Summ. J. ("Aetna's Mot."), ECF No. 17).

In their motions, Defendants do not argue the merits of Keister's long-term

disability benefits claim; rather, they maintain that the Release contractually bars

Keister from bringing any claim for disability benefits at all, as a threshold matter.

(*See* AARP Benefits' Mem. at 1; Aetna's Mem. in Supp. of Aetna's Mot. ("Aetna's

Mem."), ECF No. 17-2, at 1.)  Specifically, Defendants argue that Keister knowingly

and voluntarily waived his right to bring this ERISA claim when he signed the Release

at issue, as evidenced by the fact that he knew of his disability-benefits claim before he

signed the Release, as well as the Release's emphatic language that warned Keister of

the legal significance of signing the Release. (*See* Aetna's Mem. at 4–5.) Defendants contend that the text of the Release is unequivocal: as a "general release," it covers Keister's claim for long-term disability benefits, because it expressly includes "any and all claims. . . whether now known or unknown, which may have resulted from [Keister's] AARP employment or separation or otherwise, up to and including the date [he] sign[ed] this Agreement." (*Id.* at 2; *see also* AARP Benefits' Reply in Supp. of Mot. for Summ. J. ("AARP Benefits' Reply"), ECF No. 16, at 3.)

Keister responds that the Release language shows that the parties did not intend to include ERISA claims within the Release's waiver, because the Release does not specifically mention ERISA. (*See* Pl.'s Opp'n to AARP Benefits' Mot. ("Pl.'s AARP Opp'n"), ECF No. 15, at 2–3.) In addition to citing the text of the Release, Keister points to communications between Keister and AARP Benefits' representatives as extrinsic evidence that demonstrates that the parties did not intend to cover Keister's instant claim, because Defendants "did not indicate that [Keister] would lose [the] opportunity to file an appeal of his denied LTD benefits." (Pl.'s Opp'n to Aetna's Mot. ("Pl.'s Aetna Opp'n"), ECF No. 18, at 3.) Keister argues that his claim instead falls within a carve-out provision of the Release, which excludes "any pension rights or medical benefits you may be entitled to pursuant to the AARP Employees' Welfare Plan, under the AARP Employees' Welfare Plan and the AARP Employees' Pension Plan and 401(k) Plans, or any other insurance plans." (*See id.* (citation omitted).) Keister also argues that he did not waive his right to bring the benefits claim at issue, because the claim did not exist until after he signed the Release. (*See id.* at 3–4.) Finally, Keister maintains that AARP Benefits is not an entity subject to the Release

and therefore is not entitled to raise the Release in response to Keister's claim. (*See* Pl.'s AARP Opp'n at 4.)

Aetna's motion for summary judgment became ripe on February 13, 2019 (*see* Reply in Supp. of Aetna's Mot., ECF No. 20), and AARP Benefits' motion became ripe on January 17, 2019 (*see* AARP Benefits' Reply). This Court held a hearing on Defendants' motions on July 3, 2019. (*See* Min. Entry of July 3, 2019.)

## II. APPLICABLE LEGAL STANDARD

A court must grant summary judgment under Federal Rule of Civil Procedure 56 if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law," and a dispute about a material fact is only genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The movant has the burden of demonstrating the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the non-moving party must "designate 'specific facts showing that there is a genuine issue for trial,'" *id.* at 324 (quoting Fed. R. Civ. P. 56(e)), rather than showing "[t]he mere existence of a scintilla of evidence in support of [its] position[,]" *Anderson*, 477 U.S. at 252. The movant is entitled to judgment as a matter of law if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear

6

the burden of proof at trial." *Celotex*, 477 U.S. at 323. In evaluating motions for summary judgment, a court must review all evidence in the light most favorable to the nonmoving party and draw all inferences in the nonmoving party's favor. *See Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (per curiam).

## III. ANALYSIS

When assessing whether a plaintiff has waived his right to bring a particular claim by signing a release, the normal rules of contract interpretation apply. *See Stanley v. George Wash. Univ.*, 18-cv-878, 2019 WL 3083340, at *4 (D.D.C. July 15, 2019). As explained below, upon applying the these rules to the undisputed facts of this case, this Court concludes that the plain language of the Release that Keister voluntarily signed bars Keister from bringing his claim for long-term disability benefits against Defendants; moreover, because the language of the Release is unambiguous, the extrinsic evidence that Keister now offers cannot be considered as the Court interprets the Release. Consequently, Defendants are entitled to summary judgment.

### A. The Plain Language Of The Release Shows That Keister Waived His Right To Bring This ERISA Claim

In interpreting a contractual release, a court "must rely solely upon [the] language [of the agreement] as providing the best objective manifestation of the parties' intent." *FDIC v. Parvizian, Inc.*, 944 F. Supp. 1, 3 (D.D.C. 1996) (quoting *Bolling Fed. Credit Union v. Cumis Ins. Soc'y, Inc.*, 475 A.2d 382, 385 (D.C. 1984)). Here, the Release's language is clear in its application to Keister and the defendants in this case, and the language plainly entails a general waiver of rights that indisputably applies to the ERISA claim that Keister now seeks to bring before this Court. At the same time, the narrow exceptions laid out in the Release are not applicable to Keister's claim.

1. <u>Defendant AARP Benefits Is An Entity Subject To The Release, And Is Therefore Entitled To Invoke The Release In The Instant Proceedings</u>

As a threshold matter, Keister argues that Defendant AARP Benefits is not an entity subject to the Release, and thus, that he can still proceed as against AARP Benefits even if he has waived his rights to bring his ERISA claim against his employer and Aetna. (*See* Pl.'s AARP Opp'n at 4).[3] This argument is misguided, because the unambiguous text of the Release plainly states that, by signing, Keister is releasing claims against:

> AARP, its subsidiaries *and its affiliated and related entities* and their respective officers, directors, representatives, employees, agents, successors, and assigns, whether current or former, *and employee benefit programs (and the trustees, administrators, fiduciaries, and insurers of such programs)*[.]

(Release at 3, ¶ 2 (emphasis added).)

This language includes AARP Benefits in at least two ways. First and foremost, this Court has no doubt that AARP Benefits is an "affiliated and related entit[y]" of AARP. (*Id.*) As AARP Benefits' counsel explained at the motion hearing, AARP Benefits exists solely because "AARP offers to its employees benefits[,]" and ERISA requires such employee benefits programs "to be set up with a certain structure, and that's why we have the AARP Benefits Committee, which acts as the trustees for administering the program[.]" (Hr'g Tr. at 41:21–24.) Thus, counsel clarified that AARP Benefits "is not a separate entity" from AARP for Release purposes. (*Id.* at 4:17.) And when Keister's counsel was specifically asked whether Keister was

---

[3] Keister does not dispute that Aetna is expressly covered by the Release and therefore able to raise Release-based arguments in this matter. (*See generally* Pl.'s Opp'n to Aetna; *see also* Hr'g Tr. at 23:22–24:1.)

"denying that AARP Benefits Committee, as a factual matter, is a related entity to AARP[,]" Keister's counsel answered "[n]o[,]" and conceded that AARP and AARP Benefits Committee are "not unrelated." (*Id.* at 25:23–26:1, 26:3.)

Keister's counsel's suggested nevertheless that AARP Benefits falls outside the "affiliated and related entity" language of the Release, because it has "special standing" (*id.* at 26:4) as a "fiduciary," which is a "very distinct legal position" (*id.* at 25:7–8). This argument is unavailing, because whether or not AARP Benefits has a special fiduciary relationship with Keister is irrelevant to the question of whether AARP Benefits is an "affiliated and related entit[y]" of AARP and therefore covered by the Release. (Release at 3, ¶ 2.) Moreover, as noted, Keister does not dispute that AARP Benefits is, in fact, such an "affiliated and related entit[y][.]" (*Id.*; *see also* Hr'g Tr. at 25:23–26:1, 26:3.)

AARP Benefits is also plainly covered by the Release that Keister signed if it qualifies as an administrator of one of AARP's "employee benefit programs[.]" (Release at 3, ¶ 2.) The relevant benefit program for present purposes is AARP's Group Long Term Disability Insurance Plan (*see* Compl. ¶ 5), and there is no dispute that AARP Benefits administers that Plan (*see id.* ¶ 3). Thus, if the Long Term Disability Insurance Plan (hereinafter "the Plan") qualifies as an "employee benefit program[]" within the meaning of the Release, then AARP Benefits is an entity that is subject to the Release pursuant to the Release's plain terms.

In this Circuit, courts have used "employee benefit program" to refer to any employee benefit plan or benefit package under ERISA. *See, e.g.*, *Lucile Salter Packard Children's Hosp. v. NLRB*, 97 F.3d 583, 589 (D.C. Cir. 1996) (alternating

between the use of "employees' regular benefit package," "employee benefit plan," "fringe benefit package," and "employee benefit program" to refer to the same benefits system for employees). Furthermore, as defined by ERISA itself, an "employee benefit plan" is "an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan." 29 U.S.C.S. § 1002(3). It is thus quite clear that the Plan at issue here is an employee benefit program for purposes of the Release. Indeed, in his complaint, Keister himself describes the Plan as a "welfare benefit plan created pursuant to Section 3(1) of ERISA, 29 U.S.C. § 1002(1) and offered by AARP, Inc., for the benefit of its employees" (Compl. ¶ 7), and this description brings the Plan well within the definition of "employee benefit program."

The text of the Plan document that explains "what your Plan covers and how benefits are paid" (Ex. A to Pl.'s AARP Opp'n, ECF No. 15-2, at 2 (capitalization altered)) further supports this conclusion, as it states that "participant[s] in the group insurance plan . . . are entitled to certain rights and protections under [ERISA]," and that ERISA "imposes duties upon . . . the people who operate your Plan" (*id.* at 29). What is more, courts often consider long-term disability benefit programs to be employee benefit plans under ERISA. *See, e.g.*, *Brainard v. Liberty Life Assurance Co.*, 173 F. Supp. 3d 482, 484 (E.D. Ky. 2016) ("[Plaintiff] challenges the defendant's denial of his claim for long-term disability [] benefits under an employee benefit program sponsored by his former employer[.]"); *Davis v. AK Steel Corp.*, 670 F. Supp. 2d 413, 421 (W.D. Pa. 2009) ("The Employee Benefits Department distributed information about the company's employee benefit program, including Long Term

Disability [] benefits.").

Keister's arguments to the contrary are unpersuasive. (*See, e.g.*, Hr'g Tr. at 24:6–26:4.) As explained above, whether or not AARP Benefits has a fiduciary relationship with Keister has no impact whatsoever on whether AARP Benefits is a party subject to the Release. And Keister's observation that "the agreement does not [specifically] include the Benefits Committee or the plan administrator as an entity subject to the general release" (Pl.'s AARP Opp'n at 4) does nothing to undermine this Court's conclusion regarding the entities that the Release *does* plainly cover—*i.e.*, "affiliated and related entities" of AARP, and also AARP's "employee benefit programs (and the trustees, administrators, fiduciaries, and insurers of such programs)" (Release at 3, ¶ 2). Therefore, AARP Benefits is entitled to invoke the Release, to the extent that that the Release applies to the claims at issue in this case. And, as the Court explains in Parts A.2 & A.3, *infra*, it does.

> 2.      The Release Is A "General Release" And Therefore Need Not Specifically Mention ERISA Claims In Order To Include Them

"[A] release containing language discharging 'any and all claims' is unambiguous and constitutes a general release that should not be construed narrowly." *Parvizian*, 944 F. Supp. at 3 (citation omitted). Moreover, and significantly, "[t]he mere fact that an agreement providing for a general release is silent with respect to certain matters in dispute at the time the release was executed 'does not mean that obligations and documents not expressly mentioned or integrated were not released.'" *Id.* at 4 (quoting *Hershon v. Gibraltar Bldg. & Loan Ass'n*, 864 F.2d 848, 853 (D.C. Cir. 1989)).

So it is here.  The Release that Keister signed is specifically titled "General Release" (Release at 2), and also expressly states that it "constitutes a general release" that waives "any and all claims for damages, personal injuries, discrimination, retaliation, reinstatement, or other relief . . . based upon [Keister's] employment, separation, and/or any event or transaction that occurred prior to [his] signing" the Release (*id.* at 3, ¶ 2 (capitalization altered)).  As noted above, the General Release specifically pertains to "employee benefit programs[,]" among other entities, and it expressly includes any "*legal or equitable claim of any kind*, whether based upon statute, contract, tort, common law, ordinance, regulation, or public policy" that "existed prior to the date of [Keister's] signature[,]" regardless of whether such claim was "known or unknown" at that time that Keister signed the waiver.  (Release at 3, ¶ 2 (emphasis added).)  A waiver that is that broad in scope, and that plainly pertains to employee benefit programs, clearly covers the ERISA claim that Keister now seeks to pursue.  *See Stanley*, 2019 WL 3083340, at *5 ("[Plaintiff's] ERISA claims plainly fall within the language releasing '*any and all* claims' 'for violation of *any* federal . . . statute.'" (emphasis and ellipsis in original)).

Keister insists that because the Release does not *explicitly* include ERISA claims, he did not waive his right to bring such claims (*see* Pl.'s AARP Opp'n at 4).  But this argument is antithetical to the nature of a general release and is therefore patently mistaken.  Indeed, the entire point of a general release is to allow the parties to preclude all future litigation of claims between them *without* having to identify each and every claim that might exist.  *See Hershon*, 864 F.2d at 853 (noting that releases "are designed to resolve disputes out of court—not to spawn litigation"); *see also, e.g.*,

*Mwabira-Simera v. Sodexho Marriot Mgmt. Servs.*, No. 04-0538, 2005 WL 1541041, at *2 (D.D.C. June 30, 2005) (explaining that "a broad and unambiguous release need not list every conceivable cause of action that might come within its terms," including claims under Title VII of the Civil Rights Act of 1964 or the Americans with Disabilities Act), *aff'd*, 204 F. App'x 902 (D.C. Cir. 2006). To interpret the Release the way Keister suggests would be either to do away with concept of "general" releases altogether, on the grounds that the Release does not *specifically* identify the claim Keister seeks to raise, or to elevate ERISA claims to a special status that removes them from the pantheon of "all" claims in a general release and requires them to be mentioned explicitly in order to preclude their being brought in court.

Keister provides no legal authority that supports either result. As mentioned, courts in this district typically consider the "any and all claims" language of a general release to encompass ERISA claims, *see, e.g.*, *Stanley*, 2019 WL 3083340, at *5, and this conclusion is especially reasonable with respect to general releases that patently apply to the administrators, trustees, and managers of employee benefit plans. This Court also cannot fathom any *reason* that ERISA claims should be carved out of or excluded from the general release consequence as a matter of law. It is true that courts have occasionally identified claims that are not deemed waived by general release language. *See, e.g.*, *Vahey v. Gen. Motors Co.*, No. 11-cv-661, 2012 WL 9390844, at *2–3 (D.D.C. Mar. 1, 2012) (finding that plaintiff could not waive substantive rights under the Uniformed Services Employment and Reemployment Rights Act of 1994 in a general release unless certain additional conditions were met, because "the rights and benefits listed in the statute are all substantive rights"); *Dodge v. Trs. of the Nat'l*

*Gallery of Art*, 326 F. Supp. 2d 1, 10 (D.D.C. 2004) (finding that a general release "does not waive the plaintiff's right to raise a suit . . . for constitutional violations"). But the special circumstances that exist in such cases are not evident here.

For example, courts have long held that "ERISA does not confer substantive rights on employees, but rather ensures that they will receive those benefits that the employers have guaranteed to them." *Hartline v. Sheet Metal Workers Nat'l Pension Fund*, 134 F. Supp. 2d 1, 14 (D.D.C. 2000)). As creatures of contract, ERISA claims thus appear to be subject to standard principles of contract interpretation. *Cf. McDonald v. Artcraft Elec. Supply Co.*, 774 F. Supp. 29, 34 (D.D.C. 1991) ("The Supreme Court views ERISA claims as analogous to contract actions prior to ERISA."). And *that* leads inexorably to the conclusion that the employee benefits that are conferred by consent of the parties can also be *waived* by mutual agreement. *See, e.g.*, *Russell v. Harman Int'l Indus., Inc.*, 945 F. Supp. 2d 68, 73 n.3 (D.D.C. 2013). There is no question that "general releases" are one common mechanism for waiving such contract-based claims, and Keister has failed to demonstrate any rational basis for maintaining that courts should nevertheless consider ERISA claims to be preserved when the parties have executed a general release, unless such preservation of ERISA claims is specifically noted.

Therefore, the Court concludes that the Release at issue here is a general release that need not have expressly mentioned Keister's disability benefits claim in order to apply to that claim. Thus, the Release presumptively covers Keister's ERISA claim, so long as such a claim was not expressly excepted from its coverage.

3. The Release Contains Specific Exceptions, And ERISA Claims Are Not Among Them

Keister points to the following language in the Release to support his contention that ERISA claims are *expressly excluded* from the otherwise broad waiver that Keister executed:

> The foregoing release shall not be deemed a release of any pension rights or medical benefits you may be entitled to pursuant to the AARP Employees' Welfare Plan and the AARP Employees' Pension and 401(k) Plans, or any other insurance plans. The release likewise excludes: claims arising after you sign this Agreement, claims for breach of this Agreement, and claims that cannot be waived, such as for unemployment or worker's compensation.

(Release at 3, ¶ 3.) This contract language actually undermines Keister's express-exclusion argument, rather than bolstering it.

First of all, ERISA claims are indisputably *not* "pension rights or medical benefits" (*id.*) and, therefore, are not covered by the first sentence of this text. Both courts and insurance plans routinely and consistently treat long-term disability benefits as distinct from medical and pension benefits. *See, e.g.*, *Ky. Retirement Sys. v. EEOC*, 554 U.S. 135, 144 (2008) (noting that the Age Discrimination in Employment Act "allow[s] employer to consider (age-related) pension benefits in determining level of long-term disability benefits"); *Mrkonjic v. Delta Family-Care & Survivorship Plan*, 736 F. App'x 678, 682 (9th Cir. 2018) (explaining that the plaintiff "was receiving monthly pension payments, Social Security Disability [], and workers compensation[,]" and that "[u]nder the Disability Plan's terms, these offsets had to be deducted from his gross amount of [long-term disability] benefits[.]"); *see also Gahn v. Acordia of Ky., Inc.*, 153 F. App'x 377, 378 (6th Cir. 2005) ("Under the [ERISA benefits plan], if a participant is eligible for [long-term disability] benefits, he is also eligible for retiree

medical benefits."); *Duma v. Unum Provident*, 770 F. Supp. 2d 308, 310 (D.D.C. 2011) (noting that "[t]he central focus of [the] plaintiff's action was to obtain long term disability benefits" but that the plaintiff "also sought pension payments [and] reimbursement for medically related expenses" (internal quotation marks and citations omitted)).

Notably, Keister does not appear to dispute that long-term disability benefits are distinct from pension rights and medical benefits. (*See, e.g.*, Compl. ¶ 7 ("The Disability Plan is an employee *welfare benefit* plan[.]" (emphasis added); Hr'g Tr. at 16:14–15 ("I would say that [the] benefits are distinguishable[.]").) Instead, he argues that "[t]he language in [the first sentence of the Exclusions paragraph of the Release] uses a comma to specifically distinguish insured benefits from medical and pension benefits, thereby not limiting employee benefits to medical and pension benefits, but to include *any* benefits under insurance policies" (Pl.'s Aetna Opp'n at 3 (emphasis added)). Thus, Keister interprets that sentence to read: "the foregoing release shall not be deemed a release of any pension rights or medical benefits . . . , or any other insurance plans." This strained reading contorts the grammatical organization of the sentence—by, among other things, ignoring the intervening clause that begins "pursuant to" and makes clear that the exclusion pertains to any pension rights and medical benefits that Keister has *by virtue of* the plans specified therein or any other insurance plans—and furthermore, it makes no sense. Keister never explains what it would mean to "release" an "insurance plan," which is perhaps why Keister's counsel seemed to abandon this argument during the motion hearing. Instead, Keister's counsel insisted that "the [long-term disability] plan is part of the AARP employees welfare plan" (Hr'g

Tr. at 15:8–9), and because the Release "references the plan" in its exclusions language (*id.* at 16:18), it therefore excludes Keister's ERISA claim for long-term disability benefits. But this interpretation fails as well, because, under the plain language of the exceptions clause, the exception does *not* apply to the AARP's employee welfare plan *generally*; rather, it applies only to *pension rights* and *medical benefits* that the listed welfare plans confer (or such rights and benefits that are granted by "any other insurance plans" (Release at 3, ¶ 3)), even if those plans also cover additional, non-pension and non-medical benefits, such as long-term disability benefits.

Additionally, Keister's ERISA claim clearly falls outside the exceptions listed in the second sentence of the Release's exclusions provision. Keister's claim is plainly not "for breach of [the Release]," nor is it a claim "that cannot be waived[.]" (*Id.*) It also is not a claim that arose *after* Keister signed the Release. (*See id.*) Keister's own complaint reveals that he first applied for long-term disability benefits sometime *before* July 18, 2017 (the date on which Aetna first denied his benefits application). (*See* Compl. ¶ 28.) As such, Keister's legal claim that he is entitled to long-term disability benefits arose well before he signed the Release on September 27, 2017. (*See* Release at 5.)

Keister struggles mightily to fit his claim into the exclusion's stated time frame, by asserting that he actually did not have a claim against Defendants for the purpose of the Release *until* he appealed Aetna's denial of his claim for long-term disability benefits and received a final decision on June 13, 2018. (*See* Pl.'s Resp. to Aetna's Stmt., ECF No. 18-1, at 2.) Keister offers support for the argument that his ERISA claim arose on the date of the final decision after appeal (June 13, 2018) in two ways:

first, he maintains that the claim he is litigating before this Court is different than the claim he made when he applied for long-term disability benefits—the former, he says, "is for the wrongful decision denying those benefits" (Hr'g Tr. at 31:12–13)—and, second, he insists that he did not have a claim for purposes of the Release until he exhausted all of his administrative remedies and the claim was ripe for judicial decision (*see* Pl.'s Aetna Opp'n at 4).

Neither of these attempts to push off the date on which his long-term disability benefits claim arose can succeed. In the first place, Keister cites no authority for the distinction he draws between a claim for long-term disability benefits themselves and a legal claim that seeks reversal of a denial of an application for long-term disability benefits. One might imagine that the separation agreement itself would address this alleged distinction if the parties intended it with respect to the exclusion at issue; yet, Keister points to no provision of the Release that even remotely suggests the parties' use of the phrase "claims arising after you sign this Agreement" was intended to mean something other than the ordinary understanding of when a claim arises as a matter of law. *Cf. Aucoin v. Prudential Ins. Co. of Am.*, 959 F. Supp. 2d 185, 191 (D.D.C. 2013) ("The Court considers plaintiff's claim to have arisen in New Jersey, where Prudential, as the claims administrator, denied plaintiff's disability claim."). Keister has long maintained that AARP had a binding commitment to pay him long-term disability benefits pursuant to the company's Disability Plan, and that Aetna breached this agreement in violation of the ERISA when it denied payment on July 18, 2017; furthermore, the primary relief that he seeks in the complaint that he has filed is "an order that Mr. Keister is entitled to [long-term disability] benefits" and "payment of

[long-term disability benefits][.]" (Compl. at 5.)  Thus, it is clear that Keister's claim that he was entitled to long-term disability benefits existed at least when Aetna *first* denied his application, on July 18, 2017, and if there is a distinction to be drawn between the claim for benefits that Keister had at the moment of denial, on the one hand, and the ERISA claim for benefits he has filed in federal court, on the other, it makes no difference as far as the Release exclusions are concerned.  *Cf. Pettaway v. Teachers Ins. & Annuity Ass'n of Am.*, 547 F. Supp. 2d 1, 4–5 (D.D.C. 2008) (holding that the "'clear repudiation' standard of trust law is properly applied to the ERISA in determining when a claim arises" for purposes of the statute of limitations, and concluding that the plaintiff's claim arose when "she was initially denied benefits[,]" even though she went on to appeal that decision); *Cobell v. Norton*, 260 F. Supp. 2d 98, 106 (D.D.C. 2003) (ruling that an "ERISA cause of action accrues and the limitations period begins to run when a claim for benefits is clearly and unequivocally denied" (internal quotation marks and citation omitted)).

Keister's second argument—that his ERISA claim falls within the Release's exceptions because it was not ripe for judicial decision until after he signed the Release—also fails.  It is true that "a plaintiff filing an ERISA claim must first exhaust the internal administrative remedies provided by his or her employer[,]" *Pettaway*, 547 F. Supp. 2d at 5, but that requirement applies only to filing an ERISA claim *in court*. Once again, Keister provides no legal authority to support his contention that a claim exists for purposes of a *release agreement* only if it is ripe for judicial adjudication when the release is signed, nor does he point to anything within the Release itself that would indicate that the parties intended to define "claim" in such a manner.  In fact, the

plain language of the Release suggests the opposite with respect to its scope: Keister agreed to waive "any and all claims . . . *whether now known or unknown*, which may have resulted from your AARP employment or separation or otherwise, *up to and including the date that you sign this Agreement*." (Release at 3, ¶ 2.) A claim that is working its way through the administrative process is clearly "known" to the signatory, and no rational party could have interpreted such claim to arise for the purpose of the exclusion only once the claim became ripe for judicial review, in the absence of any language stating or suggesting as much. The Release certainly could have used phrases such as "cause of action" or "judicially ripe claim," rather than "claim," or it could have explained that the Release covers only claims that have been exhausted, but it does neither. Therefore, Keister's claim for long-term disability benefits—*i.e.*, the claim he seeks to litigate here—existed and was known to him and others within the meaning of the Release before he signed the Release and is not excepted from the Release's coverage.

In short, while parties to a general release might well opt to include certain exceptions to the release's otherwise broad waiver of claims, it is "incumbent upon [the parties] to identify [the carve-outs] explicitly," and they "must accept the consequences of their failure" to do so. *Hershon*, 864 F.2d at 853; *see also Stanley v. George Wash. Univ.*, No. 18-878, 2019 WL 3083340, at *7 (D.D.C. July 15, 2019) (finding that where general release applied to "'all' violations of 'any' federal statute[,]" specific carve-out could not be interpreted so broadly as to "preserve *all* ERISA claims" because "such a broad and open-ended interpretation of the exclusion would be at odds with the language of the General Release considered as a whole" (emphasis in original)). These

same principles apply to the Release, and they amply dispose of the express exclusion

argument that Keister is making now. Put another way, while Keister might have

intended to carve out his long-term disability ERISA claim from the general release that

he was signing, he failed to do so expressly and specifically. Therefore, the ERISA

claim he makes in the instant complaint remains subject to the Release provision.

### B. Because The Release's Text Is Unambiguous, This Court Need Not, And Cannot, Consider Extrinsic Evidence

Keister has repeatedly urged the Court to review e-mail correspondence, which

he says is evidence that he "may have been misled with regard to what he was signing."

(Hr'g Tr. at 21:6–7.) But it is well established that "[e]xtrinsic evidence . . . may not

be relied upon to show the subjective intent of the parties absent ambiguity in the

contract's language[.]" *Debnam v. Crane Co.*, 976 A.2d 193, 197 (D.C. Cir. 2009)

(citation omitted); *see also Constr. Interior Sys., Inc. v. Donohoe Cos.*, 813 F. Supp. 29,

33 (D.D.C. 1992) ("Where a 'release is facially unambiguous' the Court 'must rely

solely upon its language as providing the best objective manifestation of the parties'

intent.'" (quoting *Bolling,* 475 A.2d at 385)). This is so because "it is fundamentally

important that parties be able to rely on the explicit language of written contracts[,]"

which also furthers the "public interest in certainty and finality" and prevents "every

agreement [from being] subjected to collateral attack[.]" *Hershon*, 864 F.2d at 853.

The Release at issue here is facially unambiguous with respect to the scope of its

coverage, and as a result, the Court must decline Keister's invitation to consider

extrinsic evidence in order to determine its scope.

The lack of ambiguity is apparent on the face of the Release. To begin with, the

entire separation agreement document is titled "Confidential Separation Agreement and

General Release" (Release at 2 (capitalization altered)), and as noted repeatedly above, the Release provision states unequivocally that Keister "fully and forever waive[s], discharge[s], and release[s] AARP . . . from *any and all claims* for damages, personal injuries, discrimination, retaliation, reinstatement, *or other relief that you may have* . . . based upon your employment, separation, *and/or any event or transaction that occurred prior to your signing this Agreement*" (*id.* at 3, ¶ 2 (emphasis added)). The Release goes on to state that

> [i]t is expressly agreed and understood that this Agreement constitutes a GENERAL RELEASE. You understand that you are releasing claims that you may not know about. That is your knowing and voluntary intent, even though you recognize that someday you might learn that some or all of the facts you currently believe to be true are untrue and even though you might then regret having signed this release.

(*Id.*) Additionally, according to the Release, "[i]t is further agreed that this consideration shall settle and compromise any claims you have, or may have, whether known or unknown, that existed prior to the date of your signature." (*Id.*) And there is more: under the paragraph titled "Modification & Entire Agreement[,]" the Release clearly states that, by signing, Keister "acknowledge[s] that the provisions of this Agreement constitute the entire agreement on the matters addressed and that they supersede all prior agreements or understandings with regard to such matters." (*Id.* at 4, ¶ 13.) The separate paragraph titled "Knowing & Voluntary Agreement" echoes this sentiment, by stating that Keister "affirm[s]" that he has

> not relied upon any representation or statement, written or oral, not set forth in this Agreement; that no other promise or agreement of any kind has been made to or with you by any person or entity whatsoever to cause you to execute this Agreement; . . . and that you fully understand the meaning of this Agreement, which is that it constitutes a complete General Release.

(*Id.* at 4, ¶ 14.)  This language (both the separate paragraphs and taken as a whole) is facially unambiguous with respect to the scope of the Release, which is indisputably broad and covers ERISA claims, for the reasons explained above, and the Release's listed exceptions do not create any ambiguity regarding the parties' intentions with respect to the claims.

Keister's sole basis for the introduction of extrinsic evidence regarding the parties' intentions concerning the scope of the Release is the contention that communications "between AARP and [Keister] at the time" the Release was signed render the Release's language unclear.  (Hr'g Tr. at 20:18–22; *see also* Ex. 1 to Pl.'s Aetna Opp'n, ECF No. 18-2.)  To be specific, Keister argues that, despite what the document plainly states, "when speaking with Plaintiff, AARP did not indicate that he would lose [the] opportunity to file an appeal of his denied [long-term disability] benefits."  (Pl.'s Aetna Opp'n at 3.)  Indeed, according to Keister, "AARP representatives knew Keister's benefits had been denied and did not inform him that he would need to file his appeal before executing his severance agreement.  In fact, they communicated to Plaintiff that he would have his medical benefits reinstated if his appeal was successful."  (*Id.*)  Keister thus appears to make two distinct arguments: (1) that, despite the unambiguous language of the release, the oral statements of AARP representatives render the Release ambiguous; and (2) that Keister "may have been misled with regard to what he was signing."  (Hr'g Tr. at 21:6–7.)

Keister's first argument is easily disposed of, since the text of the Release is "unambiguous on its face[.]"  *Bastin v. Fannie Mae*, 104 F.3d 1392, 1394-95 (D.C. Cir. 1997).  No less an authority than the D.C. Circuit has consistently maintained under

similar circumstances that "it would not be proper [for the Court] to consider extrinsic evidence in search of an ambiguity." *Id.* Therefore, in the face of unambiguous written contract language, this Court cannot consider the extrinsic communications between Keister and AARP's representatives to conclude that the Release is ambiguous.

Keister's second argument also fails, for the very simple reason that Keister knowingly signed an agreement that *expressly states* that the written terms of the Release "constitute the entire agreement on the matters addressed" (Release ¶ 13), and that Keister has "not relied upon any representation or statement, written or oral, not set forth in this Agreement" (*id.* ¶ 14). Given this, Keister's present suggestion that the oral representations of AARP representatives regarding preservation of his ERISA claim suffice to support a finding that the written agreement itself was fraudulently induced cannot be accepted. Moreover and in any event, even if the Court considers the extrinsic communications between Keister and AARP's representatives, there is an insufficient factual basis upon which to conclude that any such fraud occurred. *See Jacobson v. Hofgard*, 168 F. Supp. 3d 187, 195 (D.D.C. 2016).

"To successfully assert a claim for fraudulent misrepresentation, or fraud in the inducement, under District of Columbia law, a plaintiff must prove (1) a false representation, (2) in reference to a material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action taken . . . in reliance upon the representation, (6) which consequently resulted in provable damages." *Id*. (internal quotation marks and citation omitted)). The thrust of Keister's contention that AARP's representatives made "misrepresentations" to Keister regarding his pending ERISA claim (*see* Hr'g Tr. at 34:15–19) is that the representatives failed to make clear to

Keister how the Release would affect his claim for long-term disability benefits (*see id.* at 34:20–35:3 ("These are fiduciaries who are presenting documents to this individual, and, if at the time, knowing full well that he had filed a claim for benefits, needed the [long-term disability] benefits, knew that he had a cognitive impairment because that was the reason why they fired him and also represented to him that if . . . he's approved he would receive those benefits without regard to what he was signing.")). The proffered emails show that AARP's representatives made no affirmative misstatements about the impact of the Release on Keister's application and appeal rights under the long-term disability plan, even assuming that Keister interpreted those communications to mean that any future ERISA claim related to his application for long-term disability benefits was preserved despite the Release. *See* Ex. 1 to Pl.'s Aetna Opp'n at 2–6 (explaining Keister's right to appeal the denial of his application for long-term disability benefits and inquiring as to whether Keister received the Release and had any questions about it); *id.* at 3 ("Please let me know what further questions you might have about the waiver or your benefits.")). In other words, the statements that are made in the emails Keister points to are a far cry from AARP's representatives having made "a false representation . . . with knowledge of its falsity . . . [and] with the intent to deceive[.]" *Jacobson*, 168 F. Supp. 3d at 195 (internal quotation marks and citation omitted).

In addition to the fraud-in-the-inducement argument, Keister also maintains that Defendants violated a fiduciary duty that they owed to Keister under section 502(a)(3) of ERISA when they allegedly failed to explain to him in their communications that, by signing the Release, Keister would be waiving his right to pursue his claim regarding

his long-term disability benefits. (Pl.'s Resp. to AARP Benefits' Stmt. at 2; Pl.'s Mem. in Supp. of Mot. to Postpone Summ. J., ECF No. 25-1, at 4; Hr'g Tr. at 52:15–21 ("In that context of being more specific, I'm saying that they had a duty to say to Mr. Keister, 'this is going to include these claims.' They have the fiduciary duty to make that clear to him. They didn't.").)[4] Keister offers no case or other support for his suggestion that any such breach actually bears on the Court's evaluation of the scope of the Release as a matter of law. Moreover, and in any event, Keister has fallen far short of offering any evidence that comes remotely close to suggesting that a breach of Defendants' fiduciary duty occurred here.

To be sure, "[a]n ERISA fiduciary breaches its duty to act 'solely in the interest of [plan] participants and beneficiaries' by deceiving beneficiaries[.]" *Soland v. George Wash. Univ.*, 60 F. Supp. 3d 60, 64 (D.D.C. 2014) (citation omitted). But it is not at all clear that the remedy for such deception is to interpret a written agreement in a manner that conflicts with its unambiguous terms. And as explained above, there is simply no factual basis for concluding that such a dramatic departure from the ordinary rules of contract interpretation is even warranted here, given that the statements that AARP's representatives made to Keister in the emails Keister offers do not affirmatively misrepresent or mislead. *See id.* (holding that the defendant did not breach its fiduciary duty, because the plaintiff "does not point to any affirmative

---

[4] After the motion hearing, Keister filed a motion under Federal Rule of Civil Procedure 56(d), requesting to "postpone summary judgment" in order to conduct discovery so that Keister could gather "objective extrinsic evidence . . . for the purpose of understanding the language in the Exception to the General Release," and, in the alternative, seeking to amend the complaint to add a breach of fiduciary duty claim. (Pl.'s Mem. in Support of Pl.'s Mot. to Postpone Summ. J. at 1; *see also* Pl.'s Mot. Requesting that the Pending Summ. J. Mot. be Postponed Pursuant to FRCP 56(d), ECF No. 25.) Because Keister had already raised the issues on which his motion was based in the context of his opposition to the pending summary judgment motions, the Court denied the motion and addresses Keister's arguments here. (*See* Min. Order of July 11, 2019.)

misstatement . . . and did not specifically inquire about [the issue], and because [the defendant's] general advice was not misleading.")  At most, AARP's representative mentions in an email dated July 31, 2017, that "[i]f [Keister] appeal[s] and the [long-term disability benefit] claim is approved, welfare benefits may be reinstated at that point."  (Ex. 1 to Pl's Aetna Opp'n at 2.)  This email does not *mention* the Release, much less represent that its terms do not preclude the advancement of Keister's long-term disability benefits claim.  (*See id.*)

Likewise, in an email dated August 2, 2017, a different AARP representative asks if Keister "has any questions about the severance waiver"; explains that "[s]ince [long-term disability] was denied[,] [Keister's] end date with AARP will be Aug 3rd which is the last date of [Keister's] [short-term disability]"; and finishes by stating, "[p]lease let me know what further questions you might have about the waiver or your benefits."  (*Id.* at 3.)  *This* email also does not explain, explore, or establish the impact of the Release on Keister's theretofore unsuccessful attempt to receive long-term disability benefits.  And Keister does not otherwise identify any content within these emails that would support the conclusion that Defendants deceived him in a manner that would violate any fiduciary duty they owed him.  To the contrary, the emails that he offers clearly allow Keister to ask whatever questions he may have had about his claim for benefits or the Release he was considering signing, and nowhere in the emails does an AARP representative tell Keister that the Release would not apply to his pending long-term disability claim.

Consequently, even if Keister is correct that a fraudulent misrepresentation made by AARP representatives contemporaneously with the signing of the Release would

permit the Court to go beyond the unambiguous terms of the written agreement and assess extrinsic facts pertaining to whether the parties intended for Keister to be able to pursue his long-term disability benefits claim despite signing the Release, this Court finds that no evidence of a fraudulent misrepresentation has been submitted, nor has Keister established any non-speculative factual basis for the Court to authorize discovery or other proceedings to permit Keister to search for such evidence. *Cf. Freedom Watch, Inc. v. Obama*, 930 F. Supp. 2d 98, 102 (D.D.C. 2013) (explaining that an affidavit supporting a request for discovery pursuant to Federal Rule of Civil Procedure 56(d) "cannot be a generalized, speculative request to conduct discovery"); *Reshard v. Peters*, 579 F. Supp. 2d 57, 68 n.11 (D.D.C. 2008) (denying plaintiff "opportunity to conduct discovery" where plaintiff's asserted need for discovery was "based on pure speculation"). Therefore, Keister's long-term disability claim was covered by the unambiguous Release he subsequently signed, notwithstanding the comments that various AARP representatives may have made to him and/or his own expectations regarding his ability to maintain the long-term disability benefits claim after signing the Release.

## IV.    CONCLUSION

After a hearing and upon review of the parties' submissions in this case, the Court has no doubt that Keister waived his right to bring the ERISA claim he pursues here.  Therefore, as set forth in the Order dated September 30, 2019, Defendants' motions for summary judgment must be **GRANTED**.


DATE:  October 7, 2019                    *Ketanji Brown Jackson*
                                          KETANJI BROWN JACKSON
                                          United States District Judge